IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RUSSELL R. WASENDORF, SR.,<br><br>Defendant. | No. CR12-2021<br><br>ORDER REGARDING DETENTION |

**TABLE OF CONTENTS**

*I.   INTRODUCTION* .................................................. 2

*II.  PROCEDURAL HISTORY* ........................................ 2

*III. RELEVANT FACTS* .............................................. 2
   *A.  Suicide Attempt* .......................................... 2
   *B.  Criminal Activity* ........................................ 3
   *C.  Plea Agreement* .......................................... 4
   *D.  Defendant's Assets* ...................................... 5
   *E.  Defendant's Detention* ................................... 8
   *F.  Pretrial Services Report* ................................ 9

*IV.  DISCUSSION* .................................................. 10
   *A.  Legal Standard to Be Applied* ........................... 10
   *B.  Analysis* ................................................ 11
      1.  *Is Defendant's Pretrial Detention Authorized?* ...... 11
      2.  *Is There Any Condition or Combination of Conditions Which Will Reasonably Assure Defendant's Appearance as Required?* ............................................. 14
      3.  *Summary* ............................................. 16

*V.   ORDER* ....................................................... 17

## I. INTRODUCTION

On the 11th day of September 2012, this matter came on for hearing to determine whether Defendant Russell R. Wasendorf, Sr. should be detained pending further proceedings. The Government was represented by Assistant United States Attorneys Matthew J. Cole and Peter E. Deegan, Jr. The Defendant appeared in person and was represented by his attorney, Jane Kelly.

## II. PROCEDURAL HISTORY

On July 11, 2012, Defendant was charged by criminal complaint with making and using false statements in a matter within the jurisdiction of the Government of the United States, in violation of 18 U.S.C. § 1001(a)(1) and (3).[1] Defendant initially appeared on the charge on July 13. A preliminary hearing and detention hearing were scheduled for July 18. At Defendant's request, however, the hearings were later continued to July 27.

On July 26 – the day prior to the scheduled hearings – Defendant waived his right to a preliminary hearing and moved to cancel the detention hearing, while reserving "the opportunity to request a detention hearing at a later date." The motion was granted and Defendant was ordered detained pending further proceedings.

On August 13, 2012, Defendant was charged in the instant action with 31 counts of making and using false documents in violation of 18 U.S.C. § 1001(a)(3). Defendant was arraigned on August 17, and trial was scheduled for October 15. On September 7, the Court was advised that Defendant was asking for a detention hearing. The hearing was then scheduled for September 11.

## III. RELEVANT FACTS

### A. Suicide Attempt

On Monday, July 9, 2012, Black Hawk County sheriff's deputies responded to a call of a suspicious vehicle outside the offices of Peregrine Financial Group, Inc. in Cedar

---

[1] *See United States v. Russell R. Wasendorf, Sr.*, No. 1:12-MJ-00131-JSS (N.D. Iowa).

2

Falls, Iowa. Deputies found Defendant unconscious inside the vehicle, with a hose connected to the exhaust pipe cut into the convertible roof. A bottle of vodka was found in the car and authorities later learned that Defendant had taken sleeping pills which he had "stockpiled" during the previous two months. Defendant was transported to the University of Iowa Hospitals in Iowa City, where he remained until he was arrested four days later.

### B. *Criminal Activity*

Defendant is the chairman and CEO of Peregrine Financial Group, Inc. ("PFG"). Found in the car was a four-page typed note in which Defendant admits committing fraud in connection with the business.

> Through a scheme of using false bank statements I have been able to embezzle millions of dollars from customer accounts at Peregrine Financial Group, Inc. The forgeries started nearly twenty years ago and have gone undetected until now.

Note of Russell R. Wasendorf, Sr. (Government's Exhibit 1) at 1.

According to Defendant's note, "[m]ost of the misappropriated funds went to maintain the increasing levels of Regulatory Capital to keep PFG in business and to pay business loses [sic], with a portion being used to build the office building at One Peregrine Way."[2] In his note, Defendant states that "I am ready to die. I guess this is the only way out of a business I hate so much."[3]

At the hearing, Special Agent William Langdon of the Federal Bureau of Investigation provided details regarding Defendant's criminal activity. Briefly stated, Defendant diverted funds from a bank account, which was intended to hold segregated customer funds, to his own uses. For example, customer funds were used to support a restaurant ("My Verona") owned by Defendant in Cedar Falls, and a construction and development company in Romania, partially owned by Defendant.

---

[2] *See* Government's Exhibit 1 at 3.

[3] *Id.* at 4.

3

Defendant concealed his illegal activity by falsifying bank statements. For example, a fake bank statement prepared by Defendant for the period ending May 31, 2012 shows a balance in the customer's segregated account of $224,830,835.85. The true balance in the account at that time was $5,446,891,086.[4] A table comparing the actual balances to the purported balances was introduced as Government's Exhibit 6. Defendant also filed false statements with the Commodity Futures Trading Commission ("CFTC").[5] To further his concealment, Defendant obtained a post office box which he falsely identified on the fake documents as that of US Bank.[6]

## C. Plea Agreement

The parties have entered into a plea agreement, which was signed by Defendant and his attorney on September 7 and by the prosecutors on September 11.[7] According to the agreement, Defendant will waive indictment and plead guilty to a four-count Information charging him with mail fraud, embezzlement of customer funds by a person registered under the Commodity Exchange Act, making false statements to the Commodity Futures Trading Commission, and making false statements to a futures association registered under the Commodity Exchange Act. Collectively, the charges carry a maximum prison term of 50 years.

In the plea agreement, Defendant stipulates to facts supporting the charges. Specifically, Defendant admits that beginning in the early 1990s, he "fraudulently obtained and misappropriated for his own use customer funds that were supposed to be maintained by PFG for the benefit of and use by such customers to margin, guarantee, or secure

---

[4] *Compare* Government's Exhibit 4, p.42, with Government's Exhibit 5, p.43.

[5] *See* Government's Exhibits 9 and 10.

[6] *See* Government's Exhibit 8.

[7] *See* Government's Exhibit 17.

4

commodities futures and options trades."[8] The full amount of the loss is undetermined, but Defendant admits that he "embezzled and otherwise misappropriated in excess of $100,000,000 in PFG customer funds."[9] Defendant also admits making false reports to the CFTC and the National Futures Association ("NFA"), a not-for-profit industry membership corporation operated under the supervision of the CFTC.

Special Agent Langdon testified that Defendant has been cooperative with law enforcement authorities, and with a court appointed receiver, in attempting to locate and recover assets. On July 27 – just two weeks after he was arrested – Defendant met for approximately six hours with two FBI agents, two assistant United States attorneys, the receiver from Chicago, and the receiver's attorney. One month later, on August 27, Defendant met again for approximately six hours with an FBI agent, an assistant United States attorney, a postal inspector, the bankruptcy trustee, the receiver, and two or three CFTC attorneys. Langdon acknowledged that one of the CFTC attorneys was "aggressive" in his questioning, including raising his voice, but Defendant continued to cooperate and did not "lose his cool." According to Langdon, Defendant attempted to answer all of the questions put to him, and is willing to cooperate further. Letters from AUSA Deegan to Defendant's counsel confirm that Defendant "has not requested a proffer agreement or any other protection" with regard to the interviews.[10]

### D. Defendant's Assets

On July 10, 2012 – the day after Defendant's attempted suicide – the CFTC filed an action against PFG and Defendant in the United States District Court for the Northern

---

[8] *Id.* at 4.

[9] *Id.* at 5.

[10] *See* Defendant's Exhibits E and F.

District of Illinois.[11] As part of that action, a receiver was appointed to "[t]ake exclusive custody, control, and possession of all funds, property, and other assets in the possession, ownership, or control" of Defendant and any of his businesses, wherever situated, including property held jointly by Defendant and others.[12] Also on July 10, PFG filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois.[13] Special Agent Langdon testified at the instant hearing that either the receiver, the bankruptcy trustee, or the FBI have taken possession of, or restrained, all of Defendant's known assets, with the exception of those in Romania.

While the evidence is somewhat imprecise, Defendant apparently has an ownership interest in a Romanian company which develops commercial real estate. A Reuters article, dated July 13, 2012, describes the company and Defendant's role in it.[14] According to the article, Defendant joined three other Chicago traders in founding the real estate development group, which in 2007 was valued at more than $1 billion. The market crashed in 2007, however, and the newspaper article suggests that the value of Defendant's 15% ownership in the company has gone from $150 million to less than $45 million. According to a Romanian-born business partner, the company "was put into insolvency just recently but we've been successful in working our way out of this."[15] According to the Romanian partner, Defendant was not involved in the day-to-day running of the company and "never visited Romania."[16] Special Agent Langdon testified, however, that Defendant and his son had visited Romania.

---

[11] *See* Government's Exhibit 14.

[12] *Id.* at 17.

[13] *See* Government's Exhibit 18.

[14] *See* Government's Exhibit 13.

[15] *Id.* at 1.

[16] *Id.* at 2.

On September 10 – the day prior to the instant hearing – the receiver filed a 29-page First Report.[17] After reviewing the procedural background and identifying the expert's retained by him, the receiver describes Defendant's assets.

- My Verona, the restaurant owned by Defendant in Cedar Falls, "never generated a profit" and has ceased operating.

- Wasendorf & Associates, Inc. is a publishing business which includes an online bookstore and an online magazine geared toward futures trading. The receiver secured the warehouse, shut down sales through the online bookstore, and is attempting to sell the assets.

- Wasendorf Construction, LLC is owned jointly by Defendant and his son. The company owns several buildings used by Defendant's other businesses, including the PFG corporate headquarters in Cedar Falls.

- Wasendorf Air, LLC is wholly owned by Defendant. Its primary asset is a Hawker Beechcraft model 400A. The plane has been secured by the receiver and is "grounded."

- Rhombus Asset Management, Inc. is a company owned by Defendant and others to invest in Romanian real estate and related ventures. Because Romanian property must be owned by a Romanian citizen or entity, the Rhombus investors formed Avrig 35. According to the receiver, he is currently unable to quantify the value of these assets "[d]ue to multiple variables."

- Peregrine Charities is a 501(c)(3) corporation founded by Defendant and organized for charitable purposes. Pending an investigation, the Peregrine Charities bank account has been frozen.

---

[17] *See* Defendant's Exhibit G.

7

- The receiver also identified and has preserved various bank accounts held by Defendant or his businesses.

- Defendant owns his personal residence in Cedar Falls, another home in Cedar Falls used by PFG as a "corporate residence" for visiting staff and corporate guests, and a condominium in Chicago. The receiver has taken steps to secure all of Defendant's real property.

- The receiver has surrendered a life insurance policy which had a cash surrender value of $1,287,339.55. Defendant's other life insurance policy has no cash value.

- The receiver is making arrangements to sell Defendant's personal property, including a wine collection, motor vehicles, and boats.

### E. Defendant's Detention

Since his arrest on July 13, Defendant has been detained at the Linn County jail under a suicide watch. Defendant asserts he is no longer suicidal. Linda Livingston, a pastor at Ascension Lutheran Church in Marion, testified that she is a friend of Defendant and his pastor. During the past six years, Livingston and her husband have socialized periodically with Defendant and his then-fiancé, Nancy Paladino. During the four days following his suicide attempt, Livingston visited Defendant daily in the hospital. After he was moved to the Linn County jail, Livingston has continued to meet with him three or four times each week. The meetings take place in the jail conference room and have lasted up to two hours. According to Livingston, Defendant is "glad to be alive" and is no longer suicidal, although he understands that he will likely spend the rest of his life in prison. Livingston testified that if Defendant is released, he can live with her and her husband at their house in Marion, Iowa. Other former classmates and friends of Defendant

appeared at the hearing and are willing to help support him emotionally and financially if he is released.[18]

Defendant and Nancy Paladino were married in Las Vegas, Nevada, on June 30, 2012 – just nine days prior to his suicide attempt. Paladino has left the home in Cedar Falls and is apparently living with her sister in Chicago. On August 13, Paladino filed a "complaint for annulment" in the District Court for Clark County, Nevada.[19] Paladino asks that the marriage be annulled, asserting that "[a]t the time of the marriage, Defendant knew he was about to be caught and arrested for fraudulent activity, and had planned suicide to avoid the consequences. He did not advise Plaintiff of the fraud or the suicide, and married Plaintiff under false pretenses."[20] Pastor Livingston testified, however, that Paladino is seeking an annulment simply to avoid the possible financial consequences associated with being Defendant's wife. According to Livingston, Paladino's commitment to Defendant remains undeterred. In an undated letter to Defendant's counsel, Paladino writes that she has "not abandoned our relationship," talks to Defendant every day, and visits him "as often as I can."[21] According to Paladino's letter, Defendant is grateful that his suicide attempt failed and that he is still alive. Paladino offers to return to Marion and stay with Defendant at the Livingston's home while he is released.

### F. Pretrial Services Report

According to the pretrial services report, Defendant is 64 years old. He was born in Cedar Rapids, Iowa, and has lived at the same address in Cedar Falls for the past

---

[18] *See* Defendant's Exhibits B and C.

[19] *See* Government's Exhibit 16 at 8-12.

[20] *Id.* at 11.

[21] *See* Defendant's Exhibit D. The Court notes parenthetically that in her letter, Paladino identifies herself as "Nancy Paladino-Wasendorf." In her complaint for annulment, however, Paladino states under oath that "[t]he wife never changed her name." *See* Complaint for Annulment at 2 (Government's Exhibit 16 at 9).

9

32 years. He is a lifelong resident of eastern Iowa. Defendant is generally in good health, although he takes medication for an overactive thyroid, gout, arthritis, and an iron deficiency. Defendant has no prior criminal history. According to Special Agent Langdon, Defendant has surrendered his passport to the receiver.

## IV. DISCUSSION

### A. Legal Standard to Be Applied

The release or detention of a defendant pending trial is governed by the Bail Reform Act of 1984. *See* 18 U.S.C. §§ 3141 *et seq.* In *United States v. Salerno*, 481 U.S. 739 (1987), the Court upheld the constitutionality of the Act, while noting that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id.* at 755. "Consistent with the intent expressed in the legislative history, the statutory scheme of 18 U.S.C. § 3142 continues to favor release over pretrial detention." *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985).

The Act establishes a "statutory progression" regarding the release of defendants prior to trial. *Id.* at 891. Section 3142(a) provides four alternatives from which the judicial officer must choose. The Defendant may be (1) released on personal recognizance or on an unsecured appearance bond, (2) released on conditions, (3) temporarily detained for other purposes, or (4) detained under section 3142(e).

Section 3142(b) provides the court must order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." Upon such a showing, the court may order release on conditions, as described in section 3142(c). If the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, then the court must order defendant detained prior to trial, pursuant to section 3142(e). Before ordering detention, however, the court must hold a

detention hearing, which is only authorized under those circumstances enumerated in section 3142(f).

Thus, if the Government moves to have a defendant detained prior to trial, the Court must undertake a two-step analysis. *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009). The Court must first determine whether pretrial detention is authorized under section 3142(f). If pretrial detention is authorized, then the Court must determine, pursuant to section 3142(e), whether there is any condition or combination of conditions which will reasonably assure the defendant's appearance as required and the safety of any other person and the community if he is released.

### B. Analysis

#### 1. Is Defendant's Pretrial Detention Authorized?

Regarding the first step, pretrial detention of a defendant is not authorized unless the Government proves by a preponderance of the evidence that the case involves at least one of five "offense types" enumerated in section 3142(f)(1), or involves at least one of two "risk factors" identified in section 3142(f)(2). *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988) ("[T]he structure of the statute and its legislative history make it clear that Congress did not intend to authorize preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists."). The five "offense types" include crimes of violence, offenses for which the maximum sentence is life imprisonment or death, drug offenses carrying a maximum term of imprisonment of ten years or more, felonies committed by repeat offenders, and felonies involving minor victims or guns. *See* 18 U.S.C. § 3142(f)(1)(A)-(E). The government concedes that neither the charges contained in the Indictment, nor the charges in the forthcoming Information, fall within the offense types authorizing detention under section 3142(f)(1).

The "risk factors" authorizing detention under section 3142(f)(2) include "a serious risk that such person will flee," or a serious risk that the person will obstruct justice or intimidate witnesses or jurors. *See* 18 U.S.C. § 3142(f)(2)(A)-(B). The Government does not claim there is a serious risk that Defendant will obstruct justice or intimidate witnesses or jurors. Rather, if Defendant's pretrial detention is authorized, then it must be based on a finding that there is "a serious risk" that Defendant "will flee."

The Court pauses to note that a determination regarding whether this case involves a serious risk that Defendant "will flee" is not the same as determining whether there is a serious risk that Defendant will "not appear." The distinction is significant in this case because of the Government's concern that Defendant remains at risk for suicide. In determining whether there are any conditions which "will reasonably assure the appearance" of Defendant – as required under the second step of the analysis – Defendant's risk of suicide becomes relevant. However, regarding the first step – whether pretrial detention is even authorized – Congress has limited the inquiry to whether there is a serious risk Defendant "will flee."

As set forth above, all of Defendant's known assets have been seized or otherwise restrained by civil authorities or law enforcement authorities. There is no evidence Defendant has access to any cash, bank accounts, or other assets. The company plane and his vehicles have been confiscated. His passport has been surrendered. In arguing that there is a "serious risk" Defendant will flee, the Government asserts that some of the customer accounts at PFG may not be "legitimate." While it is not entirely clear to the Court, the Government apparently suggests Defendant may have established phony customer accounts for his benefit. Even if that is true – and there is no evidence to support the Government's speculation – it is unclear to the Court how Defendant would gain immediate access to those funds. While the bankruptcy trustee has apparently recommended a partial distribution to customers, it is the Court's understanding that the

receiver is resisting that request. The prospect of Defendant receiving any distribution as a "customer" of PFG in the near future is remote, at best.

The Government also expresses concern regarding Defendant's holdings in Romania. First, the Court notes that Defendant has surrendered his passport and, therefore, his ability to leave the country and enter Romania would be difficult. Second, according to the Reuters article, Defendant's Romanian partners are attempting to distance themselves from Defendant's criminal activity in the United States. It appears unlikely that his appearance in Romania would be welcomed. Third, the value of Defendant's interests in Romania is uncertain, and his ability to quickly liquidate those interests appears remote.[22]

The Court cannot detain a defendant prior to trial simply because it thinks it's appropriate to do so. *Ploof*, 851 F.2d at 10 ("§ 3142(f) does not authorize a detention hearing whenever the government thinks detention would be desirable"). Rather, the Court must first determine whether pretrial detention is authorized under 18 U.S.C. § 3142(f). As applied in this case, the Government must prove that there is "a serious risk" that Defendant "will flee." For the reasons set forth above, I am unable to make that finding here. Therefore, I conclude that Defendant's pretrial detention is not authorized under section 3142(f)(2)(A), and he must be released.

Section 3142(a) identifies the alternatives under which a defendant can be released. That is, a defendant may be released on personal recognizance, upon execution of an unsecured appearance bond, or on a condition or combination of conditions as found in section 3142(c). *See* 18 U.S.C. § 3142(a)(1) and (2). Here, the Court concludes Defendant should be released under the standard and general conditions typically imposed on defendants who are released pending trial. In addition, the Court concludes that certain special conditions should be imposed, including a requirement that Defendant reside at the

---

[22] Defendant also has a bank account in Germany. Apparently, however, the balance in the account is approximately $300.

home of Kurt and Linda Livingston in Marion, Iowa. Defendant will be confined to the residence at all times except for religious services, medical emergencies, court-ordered obligations, court appearances, and other activities which are pre-approved by his probation officer. Defendant's compliance with this requirement will be monitored with a GPS electronic monitoring device.

### 2. *Is There Any Condition or Combination of Conditions Which Will Reasonably Assure Defendant's Appearance as Required?*

As set forth above, the Court has concluded that pretrial detention is not authorized in this case under section 3142(f) and, therefore, it is unnecessary to proceed to the "second step" of the analysis. Even *if* I had found that there was a serious risk that Defendant will flee, however, that does not end the inquiry. That is, even if pretrial detention is authorized, it will be ordered only if the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In other words, establishing Defendant is a serious risk of flight is a prerequisite to his detention, but it is not sufficient. The government must also prove by a preponderance of the evidence that no condition or set of conditions will reasonably assure his appearance. *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003).

Here, there is no evidence to support a finding that Defendant's release would pose a danger to "any *other* person" or the community. Rather, the Government argues that there is no condition or combination of conditions which will "reasonably assure the appearance" of Defendant as required. By using the term "appearance," Congress apparently intended to include more than a risk that a defendant "will flee." That is, when considering a risk of nonappearance in the second step of the analysis, the Court may include the risk that a defendant would commit suicide if released.

It is undisputed that Defendant attempted to commit suicide on July 9, 2012. He was hospitalized for four days and has been detained in the Linn County jail under a suicide watch since that time. Defendant presented evidence that he is no longer suicidal.

14

Pastor Livingston testified that she has training and extensive experience in working with people who have attempted suicide or are contemplating suicide. Livingston, who is also a friend of Defendant, has seen Defendant three or four times per week for the last two months, with the visits lasting up to two hours. According to Livingston, Defendant is "glad to be alive" and is no longer suicidal. A letter from Defendant's wife states that she talks to him every day and visits him "as often as I can." Ms. Paladino also opines that Defendant would not "attempt to run or take his life."

The Government offered no evidence regarding Defendant's current mental status. According to Pastor Livingston, Defendant is seen weekly by a jail nurse. The jail nurse was not called to testify, nor was the Court provided with any reports which may have been generated following her visits. The Government apparently asks the Court to infer that because Defendant remains on a suicide watch at the jail, he must still be suicidal.

Regarding Defendant's risk of nonappearance due to flight, the analysis set forth in the "first step" is applicable here. While Defendant planned his attempted suicide in advance, there is no evidence that he has ever planned to flee. All of Defendant's known assets have been seized or restrained, and there is no evidence Defendant has access to any other ready assets. In determining whether there are conditions which will reasonably assure a defendant's appearance, the court cannot require that the defendant's appearance be "guaranteed." *Orta*, 760 F.2d at 892 ("The judicial officer cannot require more than an objectively reasonable assurance of community safety and the defendant's appearance at trial."). While any defendant facing serious criminal charges poses a potential risk of flight, it appears that Defendant's opportunity to flee would be limited. That opportunity can be further restrained by restricting Defendant to the Livingston residence and monitoring his compliance with a GPS monitoring device.

In determining whether there are conditions which will reasonably assure Defendant's appearance at trial, the Court must consider those factors set forth in section 3142(g), including the nature and circumstances of the offense, the weight of the evidence,

the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. Defendant's actions, which he has admitted, are reprehensible. Thousands of PFG customers have lost millions of dollars as a result of Defendant's criminal activity. But the issue before me at this time is not one of punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("a detainee may not be punished prior to an adjudication of guilt"). The district court will determine Defendant's punishment at the appropriate time. Rather, the issue here is whether there are conditions which will reasonably assure Defendant's appearance at future proceedings. Even *if* the Government had proved by a preponderance of the evidence that there is a serious risk that Defendant will flee, thereby authorizing his detention under section 3142(f)(2)(A), the Court concludes that the Government has failed to prove by a preponderance of the evidence that there are no conditions which will reasonably assure his appearance for further proceedings. *See Madoff*, 586 F. Supp. 2d at 249 ("The Act does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance.").

### 3.    *Summary*

In summary, Defendant's detention prior to trial is authorized only if the Court finds that there is "a serious risk" that Defendant "will flee." *See* 18 U.S.C. § 3142(f)(2)(A). For the reasons set forth above, I do not believe that there is a serious risk Defendant will flee and, therefore, his pretrial detention is not authorized. Even *if* pretrial detention is otherwise authorized, however, Defendant may not be detained unless there is no condition or combination of conditions which will "reasonably assure" Defendant's appearance as required. *See* 18 U.S.C. § 3142(e)(1). I believe that there are conditions which will reasonably assure Defendant's appearance at future proceedings. Specifically, Defendant will be required to reside at the home of Kurt and Linda Livingston, will be confined to the residence except for specified purposes, and his compliance will be monitored with a GPS monitoring device.

The parties have reached a plea agreement which calls for Defendant to waive an indictment and plead guilty to four counts of an information. The Court finds that a hearing should be scheduled for that purpose. After he has entered his plea of guilty, the Court will review with Defendant the terms of the Order Setting Conditions of Release.

## V. ORDER

IT IS THEREFORE ORDERED as follows:

1. A Plea Change Hearing will be held on **September 17, 2012** at **2:30 p.m.** at the United States District Courthouse, Courtroom 2/Building B, 4200 C Street SW, Cedar Rapids, Iowa.

2. Following Defendant's plea of guilty, the Court will review with Defendant the terms of an Order Setting Conditions of Release. Defendant will be released at that time.

Pursuant to 18 U.S.C. § 3145(a), the Government may file a motion with the district court for revocation of this Order, and either party may file a motion with the district court for amendment of the conditions of release.

DATED this 13th day of September, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA